UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Rebekah D. Villega, *Plaintiff*, v. Chicago Public Media, *Defendant* | No. 24 CV 3137 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

In April 2023, Rebekah Villega began working at Chicago Public Media ("CPM") as a Senior Benefits and Compliance Manager. After CPM placed her on a performance improvement plan ("PIP"), she requested accommodations for post-traumatic stress disorder and anxiety. Soon after that, CPM terminated Villega's employment.

Villega filed this lawsuit against CPM under the Americans with Disabilities Act for disability discrimination and unlawful retaliation. [Dkt. 1.][1] Before the court is CPM's motion for summary judgment. [Dkt. 21.][2] Because Villega has presented no evidence permitting a jury to find in her favor, the court grants the motion.

I.  **Local Rule 56.1 and Summary Judgment Proceedings**

The court draws on the parties' Local Rule 56.1 statements to summarize the facts, which are undisputed except where otherwise noted. [Dkts. 31, 35.] "On summary judgment, the court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires the moving party to file a statement of material facts with citations to specific supporting evidence in the record. L.R. 56.1(a)(2); *see also* L.R. 56.1(d). The opposing party must then respond to each fact by either admitting it or disputing it with its own supporting evidence. L.R. 56.1(b)(2); *see also* L.R. 56.1(e). The non-moving party may also file additional facts supporting its position, L.R. 56.1(b)(3), subject to the same rules that governed the moving party's statement of facts. This means that it must cite "specific evidentiary material, including the specific page number, that supports it." L.R. 56.1(2).

---

[1] Villega has withdrawn her claim for failure to accommodate. [Dkt. 25 at 3 n.1.]
[2] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

Villega's submissions only sometimes comply with these requirements. At times, she fails to cite to evidence when disputing CPM's facts. [Dkt. 35, ¶¶ 35, 51, 53–55.] Other times, she disputes an asserted fact "without concisely explaining how the cited material controverts the asserted fact." L.R. 56.1(e)(3). [*Id.*, ¶¶ 14, 15.] Still other times, she quarrels with plainly immaterial aspects of an asserted fact. [*Id.*, ¶¶ 17, 18.]

Some of Villega's statements of additional facts are padded with multiple facts in violation of L.R. 56.1(d)(1) ("statement of material facts … must consist of *concise* numbered paragraphs.") [Dkt. 31, ¶¶ 5, 14.] Other paragraphs lack relevance. [Dkt. 31, ¶¶ 6, 7, 9.] Though the court has discretion to require strict compliance with Local Rule 56.1, *see Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023), it exercises its discretion not to do so here. While some of Villega's paragraphs are less concise and direct than contemplated by Local Rule 56.1(d), the court was able to adequately discern what facts were being admitted and denied, and it elects to resolve the motion on the merits rather than a technical violation of the rules.

\*   \*   \*

The court would be remiss if it did not note one troubling aspect of summary judgment proceedings. Ruling on the motion required the court to sift through portions of some depositions to determine whether facts were genuinely disputed or material. In doing so, it observed a shocking lack of civility by counsel of record. Lawyers on both sides exhibited unprofessional, unnecessarily quarrelsome and discourteous behavior, both on the record and off. In just one example, counsel repeatedly interrupted one another and the witness, arguing about trivial matters and threatening several times to call the court to referee their disputes. [Dkt. 31-4 at 10–11, 12–13, 17–18.]

"Transcripts of depositions are often very ugly documents." *DF Activities Corp. v. Brown*, 851 F.2d 920, 923 (7th Cir. 1988). This case was no exception. The court expects civility in litigation, *see Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 946 (7th Cir. 1997), for attorneys who "behave unprofessionally during depositions make litigation harder on lawyers, parties, and courts." *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 452 B.R. 676, 686 (N.D. Ill. 2011), *aff'd*, 719 F.3d 785 (7th Cir. 2013).

## II.   Background

The court recounts the facts in the light most favorable to Villega as the non-moving party. *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023).

Villega began working for CPM in 2023 as a Senior Benefits and Compliance Manager. [Dkt. 35, ¶ 5.] Her duties included overseeing CPM's open enrollment

2

process and working with the finance and accounting team to execute payroll. [*Id.*, ¶¶ 3–4.]

Villega has PTSD and anxiety, which limit her ability to regulate her emotions, communicate, think clearly and concentrate. [Dkt. 35, ¶ 8.] Villega maintains, and CPM disputes, that during orientation, Villega disclosed to Human Resources Representatives Stephanie Bassill and Amy Wielunski that she has PTSD. [Dkt. 31, ¶ 10.] It is undisputed that between April and August 2023, Villega did not request any disability accommodations. [Dkt. 35, ¶ 9.]

Debra Chamra was Villega's direct supervisor. [Dkt. 35, ¶ 6.] In August 2023, Chamra raised concerns about Villega's preparation for the open enrollment process with CPM's Chief People Person, Lori Malatesta. [*Id.*, ¶¶ 14–18, 59.] According to CPM, Villega had failed to perform several key job responsibilities related to matters such as open enrollment, benefits presentations, and the like. [*Id.*, ¶¶ 14–15.] CPM says that on two occasions Villega failed to attend "critical" meetings; she failed to sufficiently test certain open enrollment profiles; and she failed to send out benefit information session invites to CPM employees without being prompted. [*Id.*, ¶ 16.] Villega generally disputes this, explaining that her overall work performance met expectations and that any missteps were overstated or insignificant. According to Villega, she did not fail to attend the critical meetings—she attended one meeting and was late to the other but appropriately followed up; she did send out benefit information session invites without being prompted; and she did complete "some testing [] for open enrollment." [*Id.*, ¶¶ 14–16; Dkt. 27-1, at 3–4.]

On September 1, 2023, Villega met with Chamra to discuss performance. [Dkt. 35, ¶ 21.] A week later on September 7, Chamra placed Villega on a thirty-day PIP. [*Id.*, ¶ 28.] The PIP explained that "Villega needed to demonstrate improvement in several areas, including leading the open enrollment process, maintaining and staying in front of [responsibilities that] included compliance reporting, new hire on boarding, HRIS, and state tax set-up." [*Id.*, ¶¶ 29–30.] Villega felt "able to perform the tasks listed in the PIP and did not require additional time or some form of accommodation in order to perform those tasks." [*Id.*, ¶ 33.]

It is undisputed that as of the time Villega was placed on the PIP, neither Chamra nor Malatesta knew that Villega had a disability. [Dkt. 31, ¶ 18.]

One week into the PIP, on September 13, Villega submitted an accommodation request with a letter from her psychiatric clinician, which explained that Villega "struggles with significant symptoms of PTSD and anxiety" and recommended "extra time if needed for projects and due dates and written requests that are specific and indicate expectations." [Dkt. 35, ¶ 35–38.] During her deposition, Malatesta acknowledged that this documentation alerted her to Villega's disability for the first time. [Dkt. 31, ¶ 18.] A few days later, Kate Verrant, CPM's Assistant General Counsel, emailed Villega to acknowledge receipt of the request and to schedule a

3

meeting about appropriate accommodations. [Dkt. 35, ¶¶ 39–40.] At the same time, Villega drafted an addendum to the PIP that did not mention PTSD or any other disability, nor any accommodation request, [*Id.* ¶ 38.], though the record is unclear as to who received this addendum. [*See* Dkt. 21-8 at 31–32.]

A key meeting took place on September 18, when Villega had her first (and only) virtual check-in meeting with Chamra and Bassill as required by the PIP. [Dkt. 35, ¶ 41.] The parties disagree on exactly what was said, but according to Villega, Chamra started the meeting by asking questions about the status of the items in the PIP, and Villega was not given an opportunity to respond or speak. [*Id.*, ¶ 43.] Villega recalls that Chamra's "voice became louder and she was noticeably aggravated," something that triggered Villega's PTSD and later a panic attack. [*Id.*, ¶¶ 43–44.] CPM, for its part, maintains that Villega did not want to discuss the PIP or her progress with action items, and instead focused on Chamra's failure to communicate. [*Id.*] All agree that Villega became upset, started crying, and abruptly disconnected the meeting without explanation. [*Id.*; Dkt. 31, ¶ 19.]

The next day, Verrant and Villega met to discuss potential accommodations for Villega. [Dkt. 35, ¶¶ 45–51, 60.] Later that same day, Malatesta, Chamra, and Chamra's supervisor met to discuss Villega's employment. [*Id.*, ¶¶ 53–54.] It is undisputed that this meeting is when Chamra first learned of Villega's disability and her accommodation request. [Dkt. 31, ¶ 18.][3] After consulting with one another, Chamra made the decision to terminate Villega, which was communicated to Villega in writing on September 20. [Dkt. 35, ¶ 55; Dkt. 31, ¶ 21.] The letter explicitly referenced the September 18 check-in meeting, explaining that Villega "refused to discuss" her progress with tasks and that the check-in culminated in Villega "abruptly leaving the meeting without explanation." [Dkt. 21-11 at 1.] According to the letter, "the employment relationship has frayed to the point where [Villega was] no longer willing to engage in constructive conversation with [her] supervisor," and CPM "did not believe it would be constructive to complete the remainder of the [PIP]." [Dkt. 35 ¶¶ 56–57; Dkt. 21-11 at 1.] This lawsuit followed.

## III. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent*

---

[3] During her deposition, Villega testified that she shared her PTSD diagnosis during her initial orientation and that "HR should have told [Chamra]" that first week. [Dkt. 21-4 at 25.] But this is pure speculation, and speculation cannot create a genuine issue of fact to defeat summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

4

*Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The court construes the evidence in the light most favorable to the non-moving party, giving her the benefit of all reasonable inferences. *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

IV. Analysis

   A. **Disability Discrimination**

Count I alleges disability discrimination, specifically that CPM unlawfully terminated Villega's employment in violation of the ADA, which prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to … [the] discharge of employees … job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). [Dkt. 1.]

For a disability discrimination claim to succeed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Villega must show that "(1) [she] is disabled; (2) [she] is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability." *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020). The evidence must establish, by a preponderance of the evidence, that Villega's disability was the but-for cause of her termination. *Brooks v. Avancez*, 39 F.4th 424, 440 (7th Cir. 2022); *Kurtzhals*, 969 F.3d at 728.

There is no dispute that Villega is disabled and that her termination is an adverse employment action. [*See* Dkt. 21-1 at 9.] CPM argues that Villega cannot establish the second and fourth elements of her claim because she was terminated for not meeting CPM's legitimate expectations, not because of her disability. [Dkt. 21-1 at 9.] Villega, on the other hand, maintains that CPM's legitimate expectations were only pretext for discrimination.

"Where legitimate expectations and pretext overlap," as is the case here, the court "can be more efficient by addressing both together rather than first determining whether there is a prima facie case of discrimination and then turning to pretext." *Brooks*, 39 F.4th at 435. Doing so is more in keeping with the holistic approach established in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Ultimately, "the only question that matters [is] when looking at the evidence as a whole, whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action." *Brooks*, 39 F.4th at 433 (quoting *Ortiz*, 834 F.3d at 765). Under *Ortiz*, the court looks at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination. *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023).

CPM offers non-discriminatory reasons for Villega's termination, including her failure to comply with the PIP, and her refusal to discuss her performance progress, which manifested in her decision to abruptly leave the September 18 check-in meeting without explanation. [Dkt. 21-1 at 9.] This means that Villega's discrimination claim fails unless a reasonable jury could find that CPM's reasons were pretextual. Pretext is defined as a "dishonest explanation, a lie rather than an oddity or an error." *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024); *Brooks*, 39 F.4th 424, 435 (7th Cir. 2022) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.") Proving pretext requires a plaintiff to "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 914 (7th Cir. 2025) (internal citation omitted). In considering whether an employer's professed reasons were pretextual, the court does "not evaluate whether the employer's proffered justification was accurate or even whether it was unfair." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). Instead, the "sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Id.*; *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022) (if an employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual.")

Villega first points to deviation from standard practices, arguing that she was prematurely "taken off of the PIP before she had even gotten halfway through it" and terminated—even though she was timely completing many of the PIP's goals and there was good reason to believe she would complete the remaining goals successfully. [Dkt. 25 at 14.] In support of her deviation argument, she points to Malatesta's deposition testimony, who explained that one goal of a PIP is for an employee to continue employment, and that terminating an employee before the PIP's due date doesn't happen often. [Dkt. 21-7 at 5 (Malatesta's Dep. Tr. 14:3–14:11) ("Q.: That doesn't happen very often, though, correct? Normally you would allow them to finish out the performance plan before making a decision as to whether they remain employed, is that correct? [ … ] A.: Yes.").]

An "employer's divergence from its standard [employment] practices can establish, or at least be evidence of, pretext and defeat summary judgment." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 717 (7th Cir. 2023). For a policy deviation to be probative of discrimination, though, courts typically look for some evidence linking the policy departure to a discriminatory motive, such as proof that "an employer has applied its policies differently between protected-class and non-protected-class members." *Id.* (collecting cases on selective policy enforcement); *see also Cunningham v. Austin*, 125 F.4th 783, 791 (7th Cir. 2025) (deviation from policy not probative of discrimination without evidence linking deviation to plaintiff's protected status). Here, even assuming that Malatesta's testimony could establish deviation from a standard practice of allowing employees to complete a PIP before deciding whether

to terminate, there is no evidence that any deviation here was motivated by Villega's disability. For instance, she submits no evidence suggesting that similarly situated employees on a PIP who were not disabled were permitted to complete a PIP in its entirety when Villega was not. Nor does she cite any evidence suggesting that CPM generally treated non-protected-class members on PIPs more favorably than Villega was treated. *Barnes-Staples*, 88 F.4th at 717. Of course, additional evidence could strengthen the causal connection, but Villega has not come forward with any.

Next up is suspicious timing. [Dkt. 25 at 14–15.] According to Villega, the timing of her termination is suspicious because the same day that Chamra learned of Villega's PTSD and request for accommodation—September 19—is the same day that Chamra made the decision to fire Villega. This timing, Villega says, is even more suspicious considering that Villega was terminated before being allowed to complete the PIP even though she was on track to successfully complete it.

"Occasionally … an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011); *see, e.g.*, *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) ("very close" temporal proximity can suffice); *Casna v. Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Suspicious timing alone, however, rarely establishes causation, *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015), "particularly when there are reasonable non-suspicious explanations for the timing of the adverse employment action." *McCann vs. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020). Context is an important consideration in evaluating whether suspicious timing warrants an inference of causality, and significant intervening events can weigh against finding that timing was suspicious. *See Davis v. Time Warner Cable*, 651 F.3d 664, 675 (7th Cir. 2011); *Coggins v. Medline Indus., Inc.* 749 F.Supp.3d 960, 969 (N.D. Ill. 2024) (in the two week period between when an employer learned of employee's disability and her termination, employee refused to comply with a vaccination requirement, meaning that without additional corroborating evidence, timing alone was not enough to survive summary judgment).

Here, it is true that the decision to terminate Villega occurred on the very day that Chamra learned of Villega's disability and request for an accommodation. And it is also true that Villega was terminated before the natural expiration of the PIP. But CPM points to interceding events, most notably Villega abruptly ending the September 18 check-in meeting, to argue that an inference of suspicious timing can't be drawn. It notes that Chamra documented Villega's performance and communication concerns before Chamra was aware of Villega's disability. It's also undisputed that Chamra was unaware of Villega's disability or her request for an accommodation when she placed Villega on the PIP, or as of the September 18 check-in meeting. [Dkt. 31, ¶ 18; Dkt. 21-4, at 25–26.] At best, then, the close timing constitutes a small amount of pretext—not enough to sustain Villega's claim on its own, but something to add to the pile. *See Ortiz*, 834 F.3d at 766.

7

Finally, Villega argues that she has demonstrated pretext because nearly every allegation by Chamra relating to Villega's poor performance is genuinely disputed. [Dkt. 25 at 15.] But nothing about Villega's evidence calls into question the *sincerity* of CPM's decision to place her on a PIP and ultimately terminate her. "To show pretext, a plaintiff must do more than simply allege that an employer's stated reasons are inaccurate; [she] must still have some circumstances to support an inference that there was an improper motivation proscribed by law." *Tyburski v. City of Chicago*, 964 F.3d 590, 599 (7th Cir. 2020); *Monroe*, 871 F.3d at 505 ("[T]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge.")

Perhaps CPM was wrong in its assessment of Villega's performance issues, "but even then, error is not enough to show pretext." *Vassileva*, 118 F.4th at 874. Courts are not "super-personnel departments who sit in judgment of management decisions." *Brooks*, 39 F.4th at 436. The only question is whether CPM "honestly believed it had a non-discriminatory reason for termination" *Id*. Villega's evidence in this regard, at best, shows that CPM made a mistake when it concluded her performance was sufficiently unsatisfactory to terminate her, but that cannot show but-for causation.

Even when viewed with the benefit of all inferences drawn in Villega's favor, and even considering all of her arguments together under *Ortiz*—suspicious timing and deviation from standard practices—no reasonable juror could conclude that the reasons offered for Villega's termination are a mask for illegal discrimination, that is, a sham to cover up discriminatory motives. *Vassileva*, 118 F.4th. at 874; *Monroe v. Ind. Dep't of Trans.*, 871 F.3d 495, 503–04 (7th Cir. 2017).

### B. Retaliation

To prevail on a claim of retaliation under the ADA, a plaintiff must show: (1) statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024). For Villega to have engaged in protected activity under the ADA, she "must have asserted [her] rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to [his] disability." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 n.6 (7th Cir. 2023) (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015)).

Villega's retaliation claim fails for the same reasons just discussed: she cannot show a causal connection between her request for an accommodation and her termination. She advances no new or different arguments in support of her retaliation claim than those discussed above, so no reasonable jury could find that Chamra based the termination decision on Villega's request for an accommodation.

### IV. Conclusion

The court grants Chicago Public Media's motion for summary judgment.

Enter: 24-cv-3137
Date: November 21, 2025

_____
Lindsay C. Jenkins
United States District Court Judge

9